## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| KEITH HALL, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-12-1776 |
| | § | |
| HAWORTH, INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION
## ON MOTION FOR SUMMARY JUDGMENT

This matter was referred by United States District Judge Vanessa D. Gilmore, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #31). In this class action lawsuit, Keith Hall ("Hall"), Patrick McCurdy ("McCurdy"), Rachel Childress ("Childress"), and Dale Halvorson ("Halvorson") (collectively, "Plaintiffs") bring claims against Defendant Haworth, Inc. ("Defendant," "Haworth") for unpaid overtime wages under the Fair Labor Standards Act ("FLSA").[1] Pending before the court is a motion for summary judgment that was filed by Haworth. (Defendant Haworth, Inc.'s Motion for Summary Judgment and Brief in Support ["Motion"], Docket Entry #62). Plaintiffs have responded in opposition to the motion, and Defendant has replied. (Plaintiffs' Response to Defendant Haworth's Motion for Summary Judgment ["Response"], Docket Entry #69; Defendant Haworth, Inc.'s Reply Brief in Support of Motion for Summary Judgment ["Reply"], Docket Entry #70). Having reviewed the pleadings, the evidence, and the applicable law, it is RECOMMENDED that Defendant's motion for summary judgment be GRANTED.

---

[1] Plaintiffs originally sued six additional parties, who have since been dismissed as defendants in this action. (*See* Docket Entries #39, #59).

**Background**

Haworth, Inc., the remaining Defendant in this action, "manufactures and sells modular furniture" through dealers located in the United States and elsewhere. (Plaintiff's Original Complaint ["Complaint"], Docket Entry #1, at 3; Defendants' First Amended Answer to Plaintiff's Complaint ["Answer"], Docket Entry #36-1, at 6). Its headquarters are in Holland, Michigan, but it "operates over 20 wholly owned manufacturing facilities in 10 different countries, 55 sales offices[,] and 600 dealers worldwide." (Complaint at 3; Answer at 7). Plaintiffs Keith Hall, Patrick McCurdy, Rachel Childress, and Dale Halvorson were employees of Haworth. Hall was employed as a Global Account Manager ("GAM") from January 25, 2010, until his termination on February 10, 2012. (Complaint at 1, 7; Answer at 3, 15; Keith Hall Deposition Excerpts ["Hall Depo."], Docket Entry #62-23, at 63). His office was in Houston, Texas. (*Id.*). McCurdy was a Business Development Manager ("BDM") for the company's San Francisco, California, area offices from October 17, 2011, until he was terminated on May 8, 2012. (Patrick McCurdy Deposition Excerpts ["McCurdy Depo."], Docket Entry #65-1, at 119 & Exhibit ["Ex."] 2). Childress worked for Haworth as a BDM in Dallas, Texas, from June 2008, until she resigned in November 2010. (Rachel Childress Deposition Excerpts ["Childress Depo."], Docket Entry #63-13, at 13). And Halvorson was employed by Haworth as a BDM from June 2009 through December 2012, in a region which included Fort Worth and Lubbock, Texas. (Dale Halvorson Deposition Excerpts ["Halvorson Depo."], Docket Entry #64-1, at 32, 52-53, 152-53). None of these Plaintiffs was compensated for any "overtime" hours. (*See* Motion at 27).

On June 13, 2012, Hall filed this lawsuit, "on behalf of 'Global Account Managers' and 'Business Development Managers' ... currently or formerly employed by Haworth" for unpaid

overtime wages under the Fair Labor Standards Act. (*Id*. at 1). In his Complaint, Hall alleged that Haworth misclassified him, all other GAMs, and BDMs as outside sales persons who were not eligible to receive overtime pay under the FLSA. (Complaint at 1). On September 27, 2012, Hall filed a motion to conditionally certify a collective class action. (Plaintiff's Expedited Motion to Conditionally Certify a Collective Action and to Issue Notice, Docket Entry #22). In that motion, Hall sought "an order from the Court conditionally certifying a collective action under FLSA Section 216, and authorizing Plaintiff to issue opt-in notices to similarly situated salespeople who have worked for Defendants over the past three years who are also owed overtime pay." (*Id*. at 2). On May 22, 2013, the court granted that motion, and McCurdy, Childress, and Halvorson subsequently joined the lawsuit. (Docket Entries #43, #48-50).

On December 16, 2013, Haworth filed its motion for summary judgment. In that motion, the company argues that the evidence demonstrates clearly that, to conduct their sales work, Plaintiffs were required to regularly and customarily meet with clients, potential clients, and client "influencers" away from Haworth's offices. (Motion at 1-2). Haworth states that, as a consequence, their jobs are exempt from the overtime requirements of the FLSA. (*Id*.). Haworth argues, as well, that some of Plaintiffs' claims are barred by the statute of limitations. (*Id*. at 26-28). Having reviewed the pleadings, the evidence, and the applicable law, the court recommends that Defendant's motion for summary judgment should be GRANTED.

**Standard of Review**

Summary judgment is appropriate when "'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant[ is] entitled to judgment as a matter of law.'" *Pustejovsky v. Pliva, Inc*., 623 F.3d

271, 275-76 (5th Cir. 2010) (quoting FED. R. CIV. P. 56(c); citing *Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 364 (5th Cir. 2009)). "'Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving part[ies], there is no genuine issue for trial.'" *Hillman v. Loga*, 697 F.3d 299, 302 (5th Cir. 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Under Rule 56(c), the moving party "bears the initial burden of 'informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Taita Chem. Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003). The party moving for summary judgment "'must demonstrate the absence of a genuine issue of material fact,' but 'need not negate the elements of the non-movant[s'] case.'" *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)); *see Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). If the moving party fails to meet its initial burden, its motion for summary judgment must be denied, regardless of the non-movants' response. *See Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001); *Little*, 37 F.3d at 1075.

When the moving party has met its Rule 56 burden, the non-moving parties cannot merely rest on the allegations in their pleadings. *See Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349-50 (5th Cir. 2005); *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995). Rather, they are required to "'go beyond the pleadings'" and produce probative evidence to show "'that there is a genuine issue for trial.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075; citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87); *see Izen v. Catalina*, 398 F.3d 363,

366 (5th Cir. 2005); *Taita Chem. Co.*, 246 F.3d at 385. If they do so, their evidence "is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Hillman*, 697 F.3d at 302; *Taita Chem. Co.*, 246 F.3d at 385. However, if the non-movants fail to respond appropriately, or if they fail to respond at all, summary judgment is not awarded to the moving party simply by default. *See Ford-Evans v. Smith*, 206 Fed. Appx. 332, 334 (5th Cir. 2006); *Hetzel v. Bethlehem Steel Corp.*, 50 F.3d 360, 362 n.3 (5th Cir. 1995); *Hibernia Nat'l Bank v. Administracion Cent. Soc. Anonima*, 776 F.2d 1277, 1279 (5th Cir. 1985); *John v. State of La.*, 757 F.2d 698, 708 (5th Cir. 1985). Instead, as always, summary judgment is appropriate only if the moving party has demonstrated the absence of a genuine issue of material fact, and shown that judgment is warranted as a matter of law. *See Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006); *Hetzel*, 50 F.3d at 362 n.3 (quoting *Hibernia Nat'l Bank*, 776 F.2d at 1279).

**Discussion**

The FLSA "requires employers to compensate employees engaged in commerce for all hours worked over forty each week at the rate of one and one half times their regular rate." *Songer v. Dillon Resources, Inc.*, 618 F.3d 467, 471 (5th Cir. 2010) (citing 29 U.S.C. § 207(a)(1)); *see Gagnon v. United Technisource, Inc.*, 607 F.3d 1036, 1041 (5th Cir. 2010). The FLSA does not mandate, however, that every employee be compensated for more than forty hours of work per week. *See Songer*, 618 F.3d at 471. Instead, the Act expressly exempts certain classes of employees from its "overtime requirements." *Id.* (citing 29 U.S.C. § 213). "When dealing with the FLSA's exemptions, the Supreme Court has reminded us that we are to narrowly construe any such exemption, 'giving due regard to the plain meaning of the statutory language and the intent of Congress.'" *Gregory v.*

*First Title of Am., Inc.*, 555 F.3d 1300, 1307 (11th Cir. 2011) (quoting *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945)).  But "the employer bears the burden to establish a claimed exemption." *Songer*, 618 F.3d at 471; *see Corning Glass Works v. Brennan*, 417 U.S. 188, 196 97 (1974); *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1224 (5th Cir. 1990).

In this case, Defendant argues that Plaintiffs are exempt from the overtime requirements, because they are persons "employed … in the capacity of outside salesman."  *See* 29 U.S.C. § 213(a)(1).  Under the regulations, an "outside salesman" includes an employee:

(1) Whose primary duty is:

(i) making sales within the meaning of section 3(k) of the Act, or

(ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and

(2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.500(a).  Plaintiffs previously stipulated that his/her "primary duty, as Global Account Managers and Business Development Managers for Haworth, was making sales within the meaning of section 3(k) of the Fair Labor Standards Act, and as defined in 29 CFR § 541.500." (*See* Order Accepting the Parties' Stipulation, Docket Entry #59).  As a result, the court's only consideration is whether Plaintiffs were "customarily and regularly engaged away from the employer's place or places of business in performing such primary duty."  29 C.F.R. § 541.500(a)(2).

The regulations define "customarily and regularly" to mean "a frequency that must be greater than occasional but which, of course, may be less than constant."  *Id.* § 541.701.  This "includes work normally and recurrently performed every workweek," and "does not include isolated or one-

time tasks." *Id*. The Department of Labor has commented that "[n]othing in [29 C.F.R. § 541.701] requires that, to meet the definition of 'customarily and regularly,' a task be performed more than once a week or that a task be performed each and every workweek." 69 Fed. Reg. 22122-01, at *22177; *see* WAGE & HOUR DIV., U.S. DEP'T OF LABOR, Opinion Letter, 2007 WL 506575 (Jan. 25, 2007).

Further, the regulations define the phrase "away from the employer's place or places of business," as follows:

> The outside sales employee is an employee who makes sales at the customer's place of business or, if selling door-to-door, at the customer's home. Outside sales does not include sales made by mail, telephone or the Internet unless such contact is used merely as an adjunct to personal calls. Thus, any fixed site, whether home or office, used by a salesperson as a headquarters or for telephonic solicitation of sales is considered one of the employer's places of business, even though the employer is not in any formal sense the owner or tenant of the property. However, an outside sales employee does not lose the exemption by displaying samples in hotel sample rooms during trips from city to city; these sample rooms should not be considered as the employer's places of business. Similarly, an outside sales employee does not lose the exemption by displaying the employer's products at a trade show. If selling actually occurs, rather than just sales promotion, trade shows of short duration (i.e., one or two weeks) should not be considered as the employer's place of business.

29 C.F.R. § 541.502.

Plaintiffs argue that this regulation "clearly requires that sales be made 'at the customer's place of business,' [and] not just generally in the vague and nebulous 'field.'" (Response at 4). Plaintiffs do not provide any support for this contention, however, relying on the regulation itself. (*See* Response at 3-4). But even the very language of the regulation supports a broader interpretation of the phrase "away from the employer's place or places of business." *See* 29 C.F.R. § 541.502. The regulation clearly distinguishes between an employer's "fixed site" of business and the display of products in a hotel or trade show. (Reply at 3 [29 C.F.R. § 541.502]). As Haworth

emphasizes, "[w]hat need would the regulations have to [make this distinction] if the sole qualifying characteristic was whether the location was the 'customer's place of business?'" (*Id*. at 3-4).

In fact, while there is a dearth of authority on this issue, most courts have nonetheless rejected Plaintiffs' contention. *See Dixon v. Prospect Mortg., LLC*, 2014 WL 130942, at *5 (E.D. Va. Jan. 14, 2014) ("[t]he regulations simply do not limit application of the outside sales exemption to those employees that consummate sales at a client's home or place of business"); *Tracy v. NVR, Inc*., 599 F. Supp. 2d 359, 363 (W.D.N.Y. 2009) (finding "no practical basis, in the regulations or elsewhere, upon which to base such a conclusion, particularly in light of the regulations' provision of a more limited definition for the term, 'employer's place of business"). Indeed, courts have held that qualifying business can be conducted "at the gym, restaurants, sporting events, community events, [and] car dealerships"; at "seminars and trade shows"; at the theater; in coffee shops; at "bridal shows, baby shows, and street fairs"; and generally anywhere "away from a fixed site." *See, e.g*., *Dixon*, 2014 WL 130942, at *4; *Cougill v. Prospect Mortg., LLC*, 2014 WL 130940, at *3 (E.D. Va. Jan. 14, 2014); *Taylor v. Waddell & Reed, Inc*., 2012 WL 10669, at *4 (S.D. Cal. 2012); *Lane v. Humana Marketpoint, Inc*., 2011 WL 2181736, at *2-4 (D. Idaho 2011); *Chenensky v. New York Life Ins. Co*., 2009 WL 4975237, at *2, 6 (S.D.N.Y. 2009); *Palmieri v. Nynex Long Distance Co*., 2005 WL 767170, at *4 (D. Me.), *adopted* 2005 WL 1058921 (D. Me. 2005). The court here is persuaded, as well, that the regulations do not require qualifying "outside sales" to take place solely at the customer's place of business.

Plaintiffs further argue that meetings with "business influencers" do not qualify as outside sales activity. (Response at 5). That term is used throughout the record in reference to such persons as "architects, contractors and interior design firms." (*Id*.; *see* Reply at 7). Again, however,

Plaintiffs fail to cite any authority for their contention. In fact, to the contrary, courts have held that meetings with those persons who may refer business, provide leads on upcoming projects, or influence potential clients are considered "exempt" work. *See Dixon*, 2014 WL 130942, at *5; *Olivo v. GMAC Mortg. Corp.*, 374 F. Supp. 2d 545, 550-51 (E.D. Mich. 2004). This conclusion is consistent with the following regulatory language, interpreting the term "primary duty":

> In determining the primary duty of an outside sales employee, work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall be regarded as exempt outside sales work. Other work that furthers the employee's sales efforts also shall be regarded as exempt work including, for example, writing sales reports, updating or revising the employee's sales or display catalogue, planning itineraries and attending sales conferences.

29 C.F.R. § 541.500(b); *see also Gregory*, 555 F.3d at 1308 (finding that activity characterized as "stimulating sales," as opposed to "obtaining orders for services," was nonetheless exempt sales activity). The law supports a finding, then, that Plaintiffs' contacts with "business influencers" should be considered in evaluating whether they were "customarily and regularly engaged away from the employer's place ... of business." *See* 29 C.F.R. § 541.500(a)(2).

In reviewing the merits of Defendant's motion, a brief description of the Global Account Manager and Business Development Manager positions is helpful. Haworth's written description for the "Global Account Manager" position states that it is a "Field Sales" job. (Terence G. Janzer Declaration ["Janzer Decl."], Docket Entry #63-13, at Ex. 1, at 1). The "position purpose" is set out, below:

> Increases Haworth's market share and long-term customer satisfaction through global account retention and expansion by developing, implementing, and monitoring strategies and action steps to achieve maximum Haworth account penetration. Meets quotas and individual performance and learning goals which are focused at supporting and developing existing major national accounts as well as targeting new business as assigned.

(*Id*.). According to the job description, a GAM is expected to "[a]ssist[] field sales organization in maximizing sales at local level." (*Id*.). To do so, he must "[t]ravel[] to customers and dealer locations to lead account strategy efforts," and must have the "[a]bility to frequently travel overnight and daily away from 'home' offices, up to 80 percent of [the] time." (*Id*. at 1-2). GAMs are eligible to participate in an auto allowance program, so long as they drive a minimum of 8,000 business miles annually. (Hall Depo. at 102-03 & Ex. 7). They can also be reimbursed for customer-related expenses such as parking, meals, and entertainment. (*Id*.).

The written description for the "Business Development Director" position likewise states that it is a "Field Sales" job. (Janzer Decl. at Ex. 2-4). The specified purpose of the BDM position is, as follows:

> Builds and maintains customer base and achieves assigned volume by identifying sales opportunities for all existing Haworth product lines.

(*Id*. at Ex. 2, at 1). It is a BDM's responsibility to "[n]etwork[] in market to prospect and generate new business opportunities beyond dealer originated opportunities to expand market share." (*Id*.). The BDM must also "[n]egotiate[] through complex process with multiple levels of clients and internal resources to reach acceptable, long-term profitable business relationship[s]," and "[d]evelop[] relationships into tangible leads." (*Id*.). The job description is explicit that BDMs "[t]ravel[] extensively away from 'home' offices." (*Id*.). In fact, the position requires the "[a]bility to frequently travel overnight and daily away from 'home' offices, up to 80% of the time."[2] (*Id*.).

---

[2] In their response to Defendant's motion, Plaintiffs attach "job descriptions" from Haworth's website that show different requirements, including much more limited travel. (Response at 7 & n. 2-3 & Ex. 3, 4). In reply, however, Defendant has shown that those descriptions "are for positions currently open and posted by Haworth for the Asia Pacific region," and "are not for GAM or BDM positions in the United States." (Reply at Ex. 1 [Declaration of Cassandra Volkers]). Indeed, Plaintiffs cite their source for the job descriptions as "http://ap.haworth.com," and it is uncontroverted that the "ap" designation stands for "Asia Pacific." (*Id*.; Response at 7 n.2-3).

In further support of its claim that the GAM and BDM positions require significant time away from the "office," Haworth has submitted sworn declarations from other employees who have held these positions, as well as excerpts from Plaintiffs' own depositions. (*See*, *e.g*., Docket Entries #62, #63 [Declarations of Robert N. Beuter, Samuel Mark D'Errico, Lori A. Garzelloni, Robert Hendrickson, Paul R. Hughes, Candace R. Hunt, Kevin S. Schuitema, Christopher J. Tornblom, Gary B. Wells]). On this record, it is clear that both job descriptions contemplate employees who will be "customarily and regularly engaged away from the employer's place or places of business." *See* 29 C.F.R. § 541.500. The question, then, is whether the evidence shows that employees holding those positions were, in fact, required to perform duties which fall within the exemption at issue.

*Keith Hall*

From January 25, 2010, through February 10, 2012, Hall was employed as a Global Account Manager for Haworth. (Complaint at 1, 7; Hall Depo. at 53, 175). In his deposition, Hall testified that his "home base of operations" was in Houston, Texas, and that his initial supervisor, Rob Hendrickson ("Hendrickson"), worked out of the corporate office in Michigan. (*Id*. at 53-54, 63). Hall agreed that an important part of his job as a GAM "was to get out into the marketplace and make face-to-face calls with ['clients and influencers']." (*Id*. at 111). In fact, he admitted that meeting with customers "in the field" was one of his "core duties" as a GAM. (*Id*. at 195).

Hall's testimony also shows that he had regular meeting with clients, potential clients, and sales leads outside of the office. He acknowledged, for instance, that "most" of his meetings with one of his top clients, Kellogg, Brown and Root ("KBR") took place in KBR's offices. (*Id*. at 55). He testified, as well, that his meetings with another regular client, Exterran, were typically held at that company's office." (*Id*. at 105-06). He further testified that his meetings with a third regular

11

customer, Marathon, were at Marathon's office "most of the time." (*Id*. at 106). Hall's testimony, as well as the weekly activity reports that he completed, also show that he regularly conducted business in dealer showrooms.[3] (*Id*. at 176-77 & Ex. A-D). Hall's testimony, and the activity reports, likewise show that it was common for him to take customers and sales leads to lunch as part of his job. (*See id*. at 107, 125-28, 176-77; *see also* Sue Butler Declaration ["Butler Decl."], Docket Entry #62-7, at 1-2 & Ex. 1). Expense reports show that Hall routinely sought reimbursement from Haworth for mileage, parking, and meal expenses that he incurred outside the office in his attempts to increase sales. (*See id*.). Clearly, there is ample evidence that Hall regularly conducted business outside of the office.

The evidence also shows that Hall was repeatedly instructed to work outside of the office more frequently. (*See* Hall Depo. at 157 & Ex. 4, 9, 16: Michell G. Kantor Declaration ["Kantor Decl."], Docket Entry #63-1, at 3-4). For instance, in a letter dated May 16, 2011, Hall was cautioned by Mitchell Kantor ("Kantor"), a supervisor, as follows:

> As an outside sales person at Haworth one of your primary responsibilities is to make face-to-face calls with clients and influencers to increase sales. To meet this expectation, it will require you to be driving to appointments to meet with clients.

(Hall Depo. at Ex. 16). Following that letter, Kantor continued to counsel Hall that he must conduct more of his activities in the field. (*Id*. at 121-25 & Ex. 12). And then, on October 14, 2011, Kantor sent Hall another letter, stating:

> You are not meeting with enough clients (including air travel that may be required for some of your Global Accounts) to successfully perform your job duties and meet

---

[3] In their response, Plaintiffs claim that the "majority of client contacts" actually occurred in showrooms which were owned by Haworth, but they present no evidence in support of this. (*See* Response at 5; Reply at 2 & n.1).

12

>your goals as an outside sales person. I asked you to increase your face-to-face appointments with end-user/influencers. You have great connections to influencers in the market yet you are not getting face-to-face appointments with Target and New clients in your sales area to meet your goals. This required immediate attention. Other than a few exceptions, your WIGS[4] [weekly reports of meetings] currently show the same meetings with the same people every week at Shell, KBR, and Kirksey.

(*Id.*). Eventually, Hall was placed on a formal Performance Improvement Plan ("PIP"). (*Id.* at 160). Under that PIP, Hall was required to make at least eight face-to-face sales calls on customers and potential customers each week. (*Id.* at 160-64 & Ex. 18, 19; Kantor Decl. at Ex. 2, 7). Hall failed to meet these goals and, on February 10, 2012, he was fired. (*Id.* at 175). This evidence shows that, as a GAM, Hall was expected to spend a considerable amount of time outside of the office performing sales functions.

In response to this evidence, Plaintiffs argue that it is unclear whether Hall met with clients at their places of business, as opposed to elsewhere in "the field." (Response at 5). However, client meetings merely have to be held outside of Haworth's offices to satisfy the exemption. *See Dixon*, 2014 WL 130942, at *5. Plaintiffs also contend that some of the evidence concerns meetings with "business influencers," rather than customers. (Response at 5-6). But the exemption is satisfied if meetings are held with "influencers," as well. *See Dixon*, 2014 WL 130942, at *5; *Olivo*, 374 F. Supp. 2d at 550-51. Plaintiffs further rely on an excerpt from Hall's deposition which they claim contradicts Defendant's evidence. (Response at 6). In particular, they note that Hall testified that his primary office was the Haworth showroom, and that he spent only 5% of his time at clients' places of business. (*Id.* at 6 & Ex. 1, at 199-209). In this same excerpt, however, Hall explained

---

[4] In his deposition, Halvorson testified that the "WIG" in "WIG report" stands for "wildly important goals." (Halvorson Depo. at 47).

that he spent 25% percent of his time "[v]isiting project sites, meeting with clients either over lunch or in their offices, going to the dealer, [and] having meetings in the dealer showroom"; 5 to 10% of his time meeting clients at project sites; and 5% of time at the clients' actual place of business. (*Id*. at Ex. 1, at 200-02). He also testified that the amount of time he spent outside of the office increased in the last six months of his employment, because of the PIP. (*Id*. at 202-03).

Here, then, Plaintiffs have not offered any evidence to rebut Defendant's showing, for purposes of summary judgment. In fact, to the contrary, Plaintiffs' evidence further supports the conclusion that Hall was "customarily and regularly engaged away from the employer's place or places of business," and, as a result, was an exempt outside sales employee for FLSA purposes. *See* 29 C.F.R. § 541.500.

*Patrick McCurdy*

Patrick McCurdy was employed by Haworth from October 17, 2011, through May 8, 2012, as a Business Development Manager, in the San Francisco Bay area. (McCurdy Depo. at 119 & Ex. 2). In his deposition, McCurdy admitted that a critical element of his job was "getting out in the field and having ... face-to-face meetings with ... individuals." (*Id*. at 40). He also testified to regular meetings with customers and business influencers outside of Haworth's offices. (*See, e.g*., at 40, 42, 57, 87, 119-20). McCurdy also completed activity reports on a weekly basis, which show that he had regular meetings with customers, potential customers, and business influencers in "the field."[5] (*Id*. at 91-92 & Ex. 8; Motion at Ex. B). Those meetings sometimes took place at restaurants, coffee shops, sporting events, and bars. (*See id*.; Butler Decl. at Ex. 2). Indeed,

---

[5] In his deposition, McCurdy explained that, unless he noted on the WIG report that a meeting took place in a Haworth showroom, it had taken place in the field or otherwise out of the office. (McCurdy Depo. at 53, 57-58).

McCurdy's expense reports show that, in the seven months that he worked for Haworth, he attended multiple trade shows, entertained clients at meals at least 75 times, and incurred more than $2,600.00 in mileage, parking, taxi, and toll expenses. (*See*, *e.g.*, Butler Decl. at Ex. 2).

Like Hall, McCurdy was also told, repeatedly, that he was not spending enough time outside of Haworth's offices to succeed at his job. (McCurdy Depo. at 73-77, 81-83, 85-86, 123). Eventually, on April 5, 2012, McCurdy's supervisor, Amy Shayeb ("Shayeb"), sent him the following "Final Written Warning":

> As an outside sales person, you are expected to be meeting face-to-face with clients and proposing Haworth solutions based on the client's needs to secure new business and expand market share. In reviewing your WIGs report, a majority of your face-to-face activities have not been focused on sales related activities but on networking activities. While networking is a great way to find leads, your focus should be on mining new business opportunities and following through with contacting the client, scheduling a meeting, proposing solutions, and securing an RFP. This is the whole point of new business development – to secure business for Haworth by developing relationships that lead to sales. The face-to-face end-user appointments are a requirement for meeting your WIG and performance to plan goals for securing new and target business and you are not performing this key requirement as a Business Development Manager with NBD focus. This is unacceptable.

(*Id.* at 74-77 & Ex. 4). Shayeb had McCurdy complete an activity tracking sheet on a weekly basis. (*Id.* at Ex. 4). On May 8, 2012, Shayeb sent McCurdy another letter, informing him that his employment was terminated. (*Id.* at Ex. 9). In that letter, Shayeb explained that, among other reasons, he was terminated because he had not adequately increased his face-to-face contact with customers and business influencers. (*Id.*).

In response to this evidence, Plaintiffs state that McCurdy testified that he was required to be in the showroom on a daily basis, rather than the customers' places of business. (Response at 6 [citing McCurdy Depo. at 60-64]). This summary of McCurdy's testimony is not accurate, however. (*See* Reply at 11). In fact, McCurdy testified that Shayeb instructed him, "that whenever I was not

15

in front of a client I was to be in the Haworth showroom." (McCurdy Depo. at 61, 62). And within the referenced excerpt, McCurdy also admitted that Shayeb expected him to be outside meeting customers "whenever possible." (*Id*. at 63). On this record, then, there is no genuine issue of material fact that McCurdy, a Business Development Manager, was "customarily and regularly engaged away from the employer's place or places of business," for purposes of the relevant exemption. *See* 29 C.F.R. § 541.500.

*Rachel Childress*

From June 2008 to November 2010, Rachel Childress worked for Haworth as a BDM in Dallas, Texas. (Childress Depo. at 13). In her deposition, Childress acknowledged that face-to-face meetings with customers were a critical component of her job. (*Id*. at 49, 58-59). In fact, she testified that "[t]he goal was always to meet the person face-to-face." (*Id*. at 49). Childress testified that meeting locations would vary, and that she held meetings "wherever [she] could."[6] (*Id*. at 70-71, 162). Childress also submitted reimbursement requests for mileage, meal, and other expenses incurred in meeting with customers, potential customers, and business influencers. (*Id*. at 61-64; Butler Decl. at 1 & Ex. 3). These requests document client entertainment on more than 100 occasions. (Butler Decl. at 3). In fact, she incurred more than $2,400.00 in mileage, parking, and toll expenses alone, in a nine-month period in 2010. (*Id*.). Childress also completed weekly WIG reports to keep track of her face-to-face meetings with customers, potential customers, and business influencers. (Childress Depo. at 74-75 & Ex. 6). These reports show that Childress regularly entertained such people in the field for meals and coffee. (*Id*.).

---

[6] Plaintiffs have submitted an excerpt from Childress's deposition in which she testified that, "[a]t Haworth, [she] was required to be in the showroom or in the dealership the majority of the time." (Response at Ex. 2, at 166). Childress also testified, however, that she was actually counseled to try to get customers into the showroom as often as possible. (*See id*. at Ex. 2, at 167-68).

On August 16, 2010, Childress's supervisor, Scott Whightsil ("Whightsil"), put her on a Performance Improvement Plan, largely due to concerns about her attitude and performance both in and out of the office. (*Id*. at Ex. 13). On October 12, 2010, Whightsil gave Childress a written performance review, informing her, in part, that she was expected to "focus[] on pulling in business (face to face interactions, cold calls, strategy planning) during prime customer contact hours." (*Id*. at Ex. 14). In November 2010, Childress was given the option to leave voluntarily and receive a severance package, or wait for a decision about termination for poor performance. (*Id*. at Ex. 15). Childress accepted the severance package, and her separation from Haworth was effective on November 17, 2010. (*Id*. at Ex. 16).

Based on the evidence in the record, it appears that Childress met, or was expected to meet, job requirements that satisfy the exemption for outside sales people. *See* 29 C.F.R. § 541.500.

*Dale Halvorson*

From June 2009 through December 11, 2012, Dale Halvorson worked for Haworth as a BDM in Fort Worth and Lubbock, Texas. (Halvorson Depo. at 32, 52-53, 152-53). In his deposition, Halvorson testified that his primary duties for Haworth were to "[m]ake sales presentations, support pricing decisions, obtain special pricing agreements, resolve customer service issues, [and] train salespeople." (*Id*. at 39-40). He also testified that he regularly "networked" with business influencers, often at restaurants or wherever the customer requested. (*Id*. at 45, 54, 73). He testified that he had regular "face-to-face meetings" at other locations, including customers' or contractors' places of business. (*See, e.g., id*. at 62-69, 72-73, 75-76, 118-19). Halvorson further testified, as follows:

> Q:   Okay. So, did you understand to succeed that you needed to get into the field and meet with -- face-to-face with competitively held accounts?

> A: Yes.
>
> Q: And that was part of your obligations as a senior BDM?
>
> A: Yes.
>
> Q: And that was for the point of increasing Haworth's market share?
>
> A: Correct.

(*Id*. at 86-87). In addition, Halvorson prepared reports of his activities, documenting numerous face-to-face meetings with customers, potential customers, and business influencers. (*Id*. at 47-48 & Ex. 8, 9, 10; Motion at Ex. D; *see also* Butler Decl. at Ex. 4). Halvorson testified that Whightsil, who was also his supervisor, emphasized on several occasions that he was to get more "face time" with customers to meet his sales goals. (*Id*. at 91-92, 108-09, 111, 114-15 & Ex. 4). On December 11, 2012, Halvorson left Haworth to take another job. (*Id*. at 153). On this record, then, there is no genuine issue of material fact that he was "customarily and regularly engaged away from the employer's place ... of business," for purposes of the relevant exemption. *See* 29 C.F.R. § 541.500.

The evidence here reveals no genuine issue of material fact on whether this class of plaintiffs' primary duty was to make outside sales, or whether they were "customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." *See* 29 C.F.R. § 541.500(a). As a result, the exemption for outside salespeople applies, so that Plaintiffs are not entitled to pay for any "overtime" hours that they might have incurred. *See id*.; *Songer*, 618 F.3d at 471. In its motion, Haworth also argues that "Halvorson is additionally exempt as a 'highly compensated employee,'" and that the statute of limitations applies to limit the period for which they could recover overtime pay. (*See* Motion at 24-27). Because the evidence shows that Plaintiffs are not eligible to receive overtime pay, however, these additional arguments need not

be addressed. For the reasons detailed in this memorandum, then, the court recommends that Defendant's motion for summary judgment be granted.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED**.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c). Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Vanessa D. Gilmore, Room 9513, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 3rd day of April, 2014.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**